## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

|   |   |   |
|---|---|---|
| **SECURITY and DATA TECHNOLOGIES, INC.,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| **v.** | : | No.  12-2393 |
| **SCHOOL DISTRICT OF PHILADELPHIA, et al.,** | : | |
| **Defendants.** | : | |

_____

**Goldberg, J.**                                                                                        **November 4, 2015**

### Memorandum Opinion

This case involves allegations that Plaintiff, Security and Data Technologies, Inc. ("SDT") was denied a multi-million dollar contract with the School District of Philadelphia (the "School District") on the basis of race. SDT has brought claims against the School District, its governing body, the School Reform Commission ("SRC"), and its former Superintendent, Arlene Ackerman pursuant to 42 U.S.C. §§ 1981, 1983.[1]

Presently before me are Defendants' motion for summary judgment and Defendants' related motion to strike several newspaper articles from the summary judgment record. For the reasons that follow, I will grant Defendants' motion to strike the articles but deny Defendants' motion for summary judgment.

_____

[1] Arlene Ackerman died on February 2, 2013. Her estate was substituted as a defendant on October 24, 2013.

# I.    FACTUAL RECORD[2]

## A.   *Defendants' Policies and Procedures Concerning Contract Awards*

Among other things, the SRC is responsible for approving resolutions, including certain contract awards, prepared by School District employees. At all relevant times, Robert Archie served as the Chairman of the SRC. During that time period, School District resolutions pertaining to contract awards normally went through an "elaborate" multi-step process prior to presentation to the SRC. The process that was in place during the applicable time period is detailed below. (Defs.' Opp. Ex. A, Nunery Dep. 15:3-20:10, 43:17-44:10; Ex. T, Archie Dep. 51:17-52:5; Pl.'s Mem. Ex. A, Archie Dep. 9:22-10:18, 11:2-6; Ex. X, Nunery Dep. 30:1-25; Ex. HH, Nunery Dep. 131:6-8.)

At the outset, a department head drafted a resolution detailing the "scope of the project, the amounts of money that would [fund] the project, the individuals involved and what the measureable outcomes would be." Next, that resolution was entered into a database to allow School District managers to code the resolution with the corresponding funding account numbers. The resolution was then vetted by senior staff and, if necessary, revised. After that process, resolutions were submitted to Deputy Superintendent Leroy Nunery for review. If Nunery approved the resolution, it was forwarded to Ackerman for her final decision as to whether it would be presented to the SRC. If Ackerman granted her approval, the resolution was forwarded to SRC liaison staff to be docketed for presentation to the SRC. (Pl.'s Mem. Ex. A, Archie Dep. 9:22-10:18, 11:2-6; Defs.' Opp. Ex. T, Archie Dep. 51:17-52:5.)

---

[2] The facts set forth in this section are undisputed unless otherwise indicated.

However, under certain exigent circumstances, resolutions did not pass through this typical vetting process. Referred to as "walk on" resolutions and generally disfavored by the SRC, these resolutions were presented to the SRC on an expedited timeline. (Id.)

All resolutions, including "walk on" resolutions, were first presented to the SRC in a closed executive session. Following the executive session, meetings were opened up to the public for comment. (Id.)

In 2003, the SRC adopted a written Anti-Discrimination Policy designed to "ensure equal opportunity in all contracts let by the District," and to create a "level playing field" on which minority or women-owned businesses ("M/WBE") could compete.[3] Pursuant to this policy, goals for M/WBE participation in School District contracts were established based upon research by the City of Philadelphia's Minority Business Enterprise Council ("MBEC").[4] In accordance with this procedure, the MBEC had set a goal of twenty percent M/WBE participation in School District contracts. In March of 2010, the School District had exceeded this goal by achieving a M/WBE participation rate of 27.3 percent. (Pl.'s Mem. Ex. A, Archie Dep. 31:23-32:21; Ex. C; Ex. H.)

The parties dispute whether Defendants pursued an unwritten policy of increasing M/WBE contracting above the goal set by the MBEC by awarding contracts on the basis of race. SDT points to the following record evidence in support of the existence of such a policy: during Archie's tenure, SRC commissioners told School District staff that students should see more minority vendors doing work in the schools. Francis Dougherty, Deputy Chief Business Officer

---

[3] School District policy defines "majority" contractor as a company that is greater than "51 percent Caucasian owned." (Pl.'s Mem. Ex. G, Smith-Hoye Dep. 13:1-8.)

[4] According to several School District administrators, the School District did not have procedures for setting goals for M/WBE participation in any individual contract. (Pl.'s Mem. Ex. G, Smith-Hoye Dep. 16:2-17:14; Ex. E, Cardwell Dep. 95:23-96:16.)

for Operations, observed "many SRC meetings where the SRC chair Bob Archie would time and time again spend the bulk of his time on the diose [sic] talking about increasing minority and women participation rates in the School District." At a meeting held in March 2010, Archie and additional SRC commissioners told John Byars, Director of Procurement, that meeting the MBEC's goal of twenty percent participation was "not enough." Jeffrey Cardwell, Senior Vice President of Facilities and School Operations, testified that the SRC had "badgered" him about the levels of minority participation reflected in contract resolutions he prepared "every month from May of 2010 all the way through that year." (Pl.'s Mem. Ex. A, Archie Dep. 63:16-66:21; Ex. F, Dougherty Dep. 96:17-22; Ex. E, Cardwell Dep. 98:1-100:5.)

Defendants argue that their only policy regarding minority contracting is the School District's official Anti-Discrimination Policy, which has an express goal of "ensur[ing] nondiscrimination in the award and administration of District Contracts." (Pl.'s Mem. Ex. C.) Senior Vice President for Capital Programs, Patrick Henwood, testified that he was unaware of any policy, outside of this official directive, that required employees to award certain contracts to minority contractors. (Defs.' Opp. Ex. F, Henwood Dep. 119:13-17.)

### B.  *The Camera Project*

In the fall of 2010, the School District received the results of a safe schools audit commissioned by the Pennsylvania Department of Education which identified nineteen schools as "persistently dangerous." On September 2, 2010, Ackerman convened a meeting to discuss the School District's response to the audit. Among other things, the conversation included a plan to install new security cameras and upgrade existing cameras throughout the persistently dangerous schools. (Defs.' Opp. Ex. A, Nunery Dep. 50:15-22, 54:7-55:12, 59:21-60:20.)

At this meeting, Ackerman stated that she wanted the camera upgrade and installation work to be completed by September 30, 2010 and tasked Dougherty with coming up with a plan for accomplishing the work within this timeframe. On September 3, 2010, Dougherty convened a meeting with staff from the School District's Information Technology Department and Office of Climate and Safety to discuss the project. Due to the time sensitive nature of the project, the participants agreed to forego the formal contract bidding process and proceed with the project as an emergency. Dougherty explained that, as a result, they looked for vendors who were "pre-qualified" by the State as eligible for work outside of the normal bidding process. SDT fit this criterion. (Defs.' Opp. Ex. A, Nunery Dep. 85:10-19, Ex. B, Dougherty Dep. 99:22-100:19, 117:10-14, 120:18-23, Ex. C, Westall Dep. 70:2-72:14; Pl.'s Mem. Ex. P, Spressart Dep. 68:7-69:18.)

Dougherty testified that members of the School District staff were "quite pleased" that SDT was available because SDT had done work for the School District in the past, including camera installation, performed well and had a good reputation for being cost effective and efficient. Based on the foregoing, the meeting participants agreed to ask SDT to prepare a quote for the project. The School District's Chief Information Officer, Melanie Harris, testified that "race played no part in that decision." (Defs.' Opp. Ex. C, Westall Dep. 70:2-72:17; Ex. D. Harris Dep. 28:17-29:13; Pl.'s Mem. Ex. F, Dougherty Dep. 143:1-144:4, Ex. Q.)

Later that day, Amy McCole, District Senior Information Technology Manager, contacted SDT's Vice President of Sales, Kenneth Spressart, to see if he was available to discuss the project. On September 7, 2010, Spressart and Joe Snell, also of SDT, met with several School District officials for approximately one and a half hours. During this meeting, School District officials described the nature of the project and Spressart confirmed that SDT was capable of

completing the project within the contemplated time frame. School District officials tasked SDT with "mark[ing]-up floor plans" and "photo-document[ing]" the nineteen persistently dangerous schools. (Pl.'s Mem. Ex. P, Spressart Dep. 107:2-108:22, 110:2-112:19, 117:1-18.)

Spressart and Snell began visiting the nineteen schools and preparing the documents the School District requested within a "day or two" of that initial meeting. Once completed, SDT submitted surveys of the nineteen schools during a meeting with McCole and another School District employee. At the conclusion of the meeting, SDT was asked to provide an estimate for the cost of the project. Spressart "threw out a number of four and a half to six and a half million." Spressart explained that the "big spread" in his estimate was a product of the fact that SDT "hadn't got to where [it] had hard solid numbers to work from."[5] SDT also provided the School District with a proposal for purchasing the necessary cameras and other security equipment. (Id. at 117:19-119:-21, 120:12-24, 133:15-134:6, 145:4-12; Defs.' Opp. Ex. E, Spressart Dep. 187:2-188:21.)

The School District asked SDT to submit a proposal that included "as much as [they] could" in terms of minority participation on the contract.[6] In response, SDT, who is owned by two white male shareholders, stated that they would hire minority-owned sub-contractors for thirty-three percent of the labor on the project and women-owned sub-contractors for thirty-four percent of the labor. (Pl.'s Mem. Ex. L, Spressart Dep. 251:22-252:3; Ex. P, Spressart Dep. 208:12-18; Ex. T.)

---

[5] Spressart testified that SDT did not forego working on any other projects in anticipation of beginning work on the camera project. (Defs.' Opp. Ex. E, Spressart Dep. 190:5-24.)

[6] If a proposed prime contractor is a M/WBE, the School District generally considers all diversity contracting goals satisfied. (Pl.'s Mem. Ex. G, Smith-Hoye Dep. 43:16-24.)

Based on this information, Dougherty and his staff prepared a "walk on" resolution ("the SDT resolution") for presentation during the SRC's next meeting which was scheduled to be held on September 22, 2010. The resolution, dated September 17, 2010, estimated the project would cost upwards of $7.5 million. The proposed resolution stated that "MBE participation for all installation services and contracted labor will be 33%" and "WBE participation for all installation services and contracted labor will be 34%." (Pl.'s Mem. Ex. V.)

On September 22, 2010, Ackerman met with the SRC in a closed executive session. The SDT resolution was included in materials provided to the SRC in anticipation of the meeting. While the SRC was in session, Ackerman decided to pull the SDT resolution. Nunery testified that he could not recall whether the SRC discussed the SDT resolution on September 22, 2010. (Pl.'s Mem. Ex. X, Nunery Dep. 30:6-25.)

The next day, September 23, 2010, Ackerman convened a meeting with seven School District employees, including Dougherty, Byars, Cardwell, and Nunery, to discuss the SDT resolution. (Pl.'s Mem. Ex. M, Byars Dep. 116:8-119:20.) The participants offer differing accounts of what transpired that day.

According to Byars, the conversation "turned racial" and Ackerman made a comment "about making sure, you know, all the white boys didn't get contracts." Byars testified that Ackerman also asked "how come a black firm can't get [the contract]?" According to Byars, Ackerman then directed him to assume responsibility for the project and to draft a resolution awarding the contract to a contractor called IBS Communications, Inc. ("IBS"). Byars testified that everyone present at the September 23rd meeting knew that "SDT is a white-owned company, and . . . that IBS is an African-American owned company." (Id.)

Cardwell and Dougherty testified in their depositions that Ackerman confused SDT with another company who had overcharged the School District in a prior project. Cardwell further stated that Ackerman simply asked the participants if IBS could be "part" of the project. Dougherty, on the other hand, testified that Ackerman said "this is something IBS can do. And we need to make that happen." Dougherty further testified that Ackerman may have referred to SDT as a white contractor and discussed "majority or minority contractors" but he was not sure. (Pl.'s Mem. Ex. F, Dougherty Dep. 166:6-171:14, 177:22-178:13, 181:19-182:9; Defs.' Opp. Ex. S, Cardwell Dep. 33:9-20, 47:14-22.)

Regardless of the differing accounts of the September 23, 2010 meeting, a resolution was drafted to award the contract to IBS as the prime contractor. On October 13, 2010, the SRC approved the resolution without any deliberation or discussion. IBS had begun work on the project prior to receiving SRC approval. (Defs.' Opp. Ex. Q, Byars Dep. 24:10-22, 38:8-12, 59:5-14; Ex. J; Pl.'s Mem. Ex. A, Archie Dep. 91:8-92:4.)

In November of 2010, the circumstances surrounding the contract decision garnered significant media coverage. Dougherty described a meeting held in response to that media coverage in which Ackerman stated "they needed to do more, contractors needed to, quote, look more like her and Lee Nunery, who, for the record, are both of African American descent." (Pl.'s Mem. Ex. F, Dougherty Dep. 89:20-90:16.) Regarding the ensuing media coverage, Harris testified that Ackerman said she "was sick of all the School District business going to majority vendors and things were going to change." (Pl.'s Mem. Ex. O, Harris Dep. 95:16-96:1.)

### C. *Relief Requested by SDT*

SDT now seeks $2.1 million in lost profits, compensatory damages, punitive damages, as well as declaratory and injunctive relief. In support of its lost profits calculation, SDT submitted

an expert report from John F. Maloney. Based on his review of SDT's financial records, Maloney concluded that SDT would have achieved a gross profit margin of twenty-nine percent on the camera project. Drawing on this conclusion, Maloney determined that SDT would have secured $2.1 million dollars in profits had it been awarded the $7.5 million dollar contract. (Pl.'s Mem. Ex. AA, Maloney Report.)

## II.     **LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable fact finder could return a verdict for the non-moving party, and a factual dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has

"fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." <u>Id.</u> at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

## III.   DISCUSSION

### A.   *Motion to Strike*

Defendants have filed a motion to strike several newspaper articles relied upon by SDT on the basis that the articles constitute inadmissible hearsay and, therefore, cannot be properly considered on summary judgment.[7] <u>See</u> <u>Smith v. City of Allentown</u>, 589 F.3d 684, 693 (3d Cir. 2009) ("Hearsay statements that would be inadmissible at trial may not be considered for purposes of summary judgment.")

---

[7] SDT argues that Defendants' motion to strike is not procedurally proper and constitutes an unauthorized supplemental reply in further support of its motion for summary judgment. I agree in part.

Following the 2010 amendments to Federal Rule of Civil Procedure 56, it is inappropriate to attack the admissibility of summary judgment evidence through a motion to strike. <u>See</u> <u>Ankney v. Wakefield</u>, 2012 WL 1633803, at *1 (W.D. Pa. May 8, 2012). The current version of rule 56 provides that "a party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

Many courts presented with motions to strike after the 2010 amendments construe motions to strike as objections under Federal Rule of Civil Procedure 56(c)(2). <u>See</u> <u>Ankney</u>, 2012 WL 1633803, at *1. As such, I will construe Defendants' motion to strike as an objection. SDT responded to Defendants' motion to strike and I will consider the parties' substantive arguments regarding the admissibility of the articles.

The articles in question concern the circumstances surrounding the School District's decision to award the camera project contract to IBS and attribute statements regarding those circumstances to School District employees, SDT employees and unnamed sources. In conjunction with these articles, SDT submitted declarations from two Philadelphia Inquirer journalists, William Marimow and Martha Woodall, who authored the articles. In their declarations, both Marimow and Woodall state that (1) if called upon to testify, they would invoke the reporters' privilege and refuse to disclose their unnamed sources and (2) all of the "facts" contained in the articles are "true and accurate." Outside of some introductory information, the declarations contain no other substantive statements. (See Pl.'s Mem. Dec. of Marimow p. 3; Dec. of Woodall p. 3.)

SDT posits that the articles are authenticated through the declarations of Marimow and Woodall as true and accurate and the statements the articles attribute to various individuals are admissible as statements of a party opponent pursuant to Federal Rule of Evidence 801(d)(2) or pursuant to the "residual exception" in Federal Rule of Evidence 807(a). SDT also asserts that Marimow and Woodall "may" testify despite their explicit statements to the contrary in their declarations.

 "[G]enerally, newspaper articles and television programs are considered hearsay under Rule 801(c) when offered for the truth of the matter asserted and statements in newspapers by individuals other than the article's author often constitute double hearsay." Merisant Co. v. McNeil Nutritionals, LLC, 242 F.R.D. 303, 308 n.3 (E.D. Pa. 2007) (internal quotation marks omitted). Nonetheless, "hearsay statements can be considered on a motion for summary judgment if they are capable of admission at trial." Shelton v. U. of Med. & Dentistry of New Jersey, 223 F.3d 220, 229 n.2 (3d Cir. 2000).

Pursuant to the "residual exception" to the rule against hearsay, a hearsay statement may be admissible if:

> (1) the statement has equivalent circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of these rules and the interests of justice.

Fed. R. Evid. 807(a). "[T]he residual hearsay exception is to be used only rarely, and in exceptional circumstances, and is meant to apply only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." United States v. Lawrence, 349 F.3d 109, 117 (3d Cir. 2003) (quotation marks and citation omitted).

After careful review of Federal Rules of Evidence 801(d)(2) and 807(a), I conclude that the newspaper articles are inadmissible hearsay and cannot be relied upon by SDT to defeat summary judgment. Even assuming all of the statements attributed to other speakers in those articles were admissible, the articles themselves constitute an additional layer of hearsay which must be independently admissible. See Smith v. City of Allentown, 589 F.3d 684, 693 (3d Cir. 2009) (where a statement offered at summary judgment contains two layers of hearsay the proponent "must demonstrate that both layers of hearsay would be admissible at trial"); Fed. R. Evid. 805 ("Hearsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule").

SDT does not offer an explanation as to how the articles themselves are independently admissible. SDT's invocation of the residual exception is unavailing because SDT has not demonstrated that the articles possess exceptional guarantees of trustworthiness. In addition to the hearsay problem, it is unclear how the statements in the articles could be authenticated at trial because the journalists who wrote the articles stated that if called to testify they would invoke the

reporters' privilege. Noting that the journalists "may" testify does not assist SDT's position. As such, the articles are inadmissible hearsay and I will not consider them in resolving the motion for summary judgment.

### B. *Motion for Summary Judgment*

In their motion for summary judgment, Defendants argue that 1) SDT has not acquired a racial identity, and, therefore cannot bring a Section 1981 claim; 2) there is no direct evidence in the record to support SDT's theory that Ackerman intentionally discriminated against SDT on the basis of its racial identity; 3) SDT has failed to offer any evidence to support its municipal liability claim against the SRC and the School District; and 4) several of SDT's damages calculations are deficient.

#### a. *Racial Identity*

Defendants first argue that SDT has not acquired a racial identity and, therefore, cannot establish a violation of Section 1981. That section provides that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts." 42 U.S.C. § 1981(a). To "make and enforce contracts" includes the "making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. at § 1981(b).

In order to establish a right to relief under Section 1981, a plaintiff must establish the following elements: (1) racial identity; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in Section 1981. Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 569 (3d Cir. 2002).

The United States Court of Appeals for the Third Circuit has yet to address the question of whether a corporation can have a racial identity for purposes of Section 1981. As noted at the

motion to dismiss stage, I agree with the holdings of the United States Court of Appeals for the Fifth and Ninth Circuits that a corporation may acquire a racial identity and, therefore, standing under Section 1981 in certain circumstances. See Holland/Blue Streak v. Barthelemy, 849 F.2d 987, 989 (5th Cir. 1988) (corporation stated claim where it alleged "that it was discriminated against in the awarding of the airport concession contract because it is primarily a white business enterprise"); Thinket Ink Info. Res., Inc. v. Sun Microsystem, Inc., 368 F.3d 1053, 1058-59 (9th Cir. 2004) ("under some circumstances corporations have satisfied the prudential standing requirements to assert § 1981 claims").

The parties disagree as to the correct standard for determining under what circumstances a corporation can be said to have acquired a racial identity. Defendants argue that a corporation has standing under Section 1981 only if it is officially certified as a corporation with a racial identity and the majority of its shareholders are of the same race. Defendants derive this rigid mandatory two-part test from Thinket Ink Info. Resources, Inc. v. Sun Microsystems, Inc., 368 F.3d 1053 (9th Cir. 2004).

The plaintiff in Thinket, a minority-owned company, was certified by the United States Small Business Administration ("SBA") as a "firm owned and operated by socially and economically disadvantaged individuals, eligible to receive federal contracts under the SBA's . . . business development program." Id. at 1055. All of the company's shareholders were African American. Id.  In concluding that the plaintiff had acquired an imputed racial identity, the Ninth Circuit reasoned that "[t]he corporate plaintiff here alleges direct racial discrimination based on its status as an SBA-certified minority-owned business and the race of its shareholders. Those allegations easily bring the corporation within the 'zone of interest' protected by § 1981." Id. at 1060. The Ninth Circuit concluded that "we join our sister circuits in holding that if a

corporation either suffers discrimination harm cognizable under § 1981, or has acquired an imputed racial identity, it is sufficiently within the statutory zone of interest to have prudential standing to bring an action under § 1981." Id.

Based on the foregoing, the Thinket case does not hold that a corporation can only acquire an imputed racial identity if it is officially certified as possessing such an identity. Rather, that Court more broadly held that a corporation can bring a Section 1981 claim if it has (1) acquired a racial identity or (2) suffered racial discrimination. Id.

Consistent with Thinket, courts have recognized that corporations may acquire racial identities for purposes of bringing Section 1981 claims in several different ways. For example, the Tenth Circuit has held that a corporation has standing to assert a claim of discrimination under Section 1981 "where such discrimination is based on the race of one of its employees." See, e.g, Guides, Ltd. v. Yarmouth Group Prop. Mgt., Inc., 295 F.3d 1065, 1072 (10th Cir. 2002).

Others courts have held that a corporation may assert a claim under Section 1981 when it is owned and/or controlled by members of one racial group. See, e.g., Florence Urgent Care v. Healthspan, Inc., 445 F. Supp. 2d 871, 877 (S.D. Ohio 2006) (company found to have standing under Section 1981 on the basis that it was "owned entirely by doctors of Arab descent"); Contemporary Pers., Inc. v. Godiva Chocolatier, Inc., 2009 WL 2431461, at * 2 (E.D. Pa. Aug. 6, 2009) (collecting cases in which corporations were found to have an imputed racial identity where "the owner, majority of shareholders and/or president are members of the specific class that is alleged to have been discriminated against"); Major Tours, Inc. v. Colorel, 799 F. Supp. 2d 376, 392  n.9 (D.N.J. 2011) (company had imputed racial identity based on the race of the company's owners.)

Consistent with the second method identified by <u>Thinket</u>, courts have also recognized that "corporations injured on account of racial discrimination have standing to sue under § 1981." <u>Witte v. Zoological Soc'y of Phila.</u>, 2007 WL 433473, at * 3 (E.D. Pa. Feb. 7, 2007) (collecting cases); <u>accord</u> <u>Gersman v. Group Health Ass'n, Inc.</u>, 931 F.2d 1565, 1568 (D.C. Cir. 1991), judgment vacated on other grounds, 502 U.S. 1068 (1992) ("In our view, however, the determination whether a corporation has a racial identity is not determinative of whether that corporation has standing to bring a discrimination claim. Rather than assume that racial identity is a predicate to discriminatory harm, we might better approach the problem by assuming that, if a corporation can suffer harm from discrimination, it has standing to litigate that harm.")

The above precedent is consistent with the plain language of Section 1981 and furthers Section 1981's purpose of providing redress for racial discrimination. Therefore, I conclude that a corporation can bring a Section 1981 claim if it has acquired a racial identity or if it has suffered racial discrimination. Therefore, the question before me is whether the evidence, viewed in the light most favorable to SDT, would support a conclusion that SDT has either acquired a racial identity or has suffered racial discrimination. I find that there is sufficient evidence to create a genuine issue of material fact as to whether SDT has acquired a racial identity.[8]

The following disputed facts support this conclusion: Byars stated that all of the September 23, 2010 meeting participants were aware that SDT was owned by white shareholders and that IBS was minority owned; Ackerman referred to SDT as part of the "white boys" who were receiving School District contracts and asked whether a "black firm" could receive the contract instead; and the School District asked SDT to make a commitment to use M/WBE sub-

---

[8] As discussed below, I also find that SDT has offered sufficient evidence on which a reasonable fact finder could find that SDT suffered harm as a result of race discrimination and, therefore, may assert a Section 1981 claim based on that theory as well.

contractors – a commitment which the School District considered generally unnecessary when the proposed prime contractor was a M/WBE. As such, I conclude that Byars' testimony creates a genuine issue of material fact regarding racial identity.

Nonetheless, Defendants seem to argue that Byars' testimony is insufficient to create a genuine issue of material fact because his account of the September 23, 2010 meeting is contradicted by the testimony of other individuals who were also present at the meeting. These alleged inconsistencies may be explored on cross-examination and are properly resolved at trial, not through summary judgment.

### b.  *Evidence of Discrimination*

Defendants contend that there is no direct evidence to support SDT's theory that Ackerman intentionally discriminated against SDT on the basis of race.[9] Defendants first urge that there is no evidence that Ackerman was aware of the race of SDT's shareholders and, as such, there is also no evidence that Ackerman's decision to pull the SDT resolution was motivated by racial animus. In support, Defendants note that several of the September 23, 2010 meeting participants testified that Ackerman confused SDT with another company which had overcharged the School District in connection with a previous project.

---

[9] "[B]oth the direct evidence test introduced by <u>Price Waterhouse v. Hopkins</u>, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and the burden-shifting framework introduced by <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)" may be used to determine whether a plaintiff has made out a violation of Section 1981. <u>Anderson v. Wachovia Mortg. Corp.</u>, 621 F.3d 261, 267-68 (3d Cir. 2010).

SDT contends that it can prevail under either the <u>McDonnell-Douglas</u> burden shifting analysis or under the <u>Price Waterhouse</u> direct evidence test. Defendants, however, urge that the burden shifting framework does not apply here because SDT is relying solely on Ackerman's alleged statements made after the September 23, 2010 meeting as direct evidence of discriminatory intent. Having concluded that SDT has offered sufficient direct evidence to withstand summary judgment, I need not consider the parties' arguments regarding the applicability of the burden shifting analysis.

Defendants also argue that SDT cannot rely on Ackerman's "stray remarks" following the September 23, 2010 meeting to prove direct discrimination because 1) they were made temporally remote from the decision to pull the SDT resolution and 2) Ackerman was not a final decision maker and, therefore, her statements cannot be used to establish that the actual decision made by the SRC to award the contract to IBS was made with discriminatory intent.

As an initial matter, Defendants' assertion that there is no evidence in the record to establish that Ackerman regarded SDT as a "majority" contractor is simply inaccurate. As noted above, Byars testified directly on this very issue. Defendants may not ignore Byars' testimony simply because they do not find him credible or persuasive in light of other evidence in the record.[10]

I find that there is sufficient evidence from which a reasonable fact finder could conclude that the decision to de-select SDT and award the contract to IBS was motivated by intent to discriminate on the basis of race. Viewed in the light most favorable to SDT, the following evidence supports this conclusion: Byars testified that the day after Ackerman pulled the SDT resolution she stated that she was making sure "all these white boys" did not receive all of the School District's contracts; Byars' further testimony that Ackerman asked why a "black firm" was not selected for the project and directed that the contract be awarded to IBS; Dougherty's testimony that, two months after the award, Ackerman said she was tired of the School District's business going to contractors who do not look like her; Harris' testimony that Ackerman said, in the context of the media coverage of the contract award, that she was sick of contracts going to

---

[10] Defendants also argue that there is no evidence that Ackerman suggested that IBS be selected to serve as the prime contractor on the project. In support, Defendants cite to Cardwell's testimony that Ackerman asked the September 23rd meeting participants if IBS could be "part" of the project. Even assuming this distinction is material, Defendants again ignore Byars' testimony detailed above.

majority vendors.[11] Based on the foregoing, a reasonable jury could find that the evidence supports a conclusion that the decision to de-select SDT in favor of IBS was the product of race discrimination in violation of Section 1981.

### c. *Municipal Liability*

Defendants further urge that, even if SDT can prove that Ackerman acted with discriminatory intent, SDT failed to offer any evidence to support its municipal liability claim against the School District and the SRC.

Under Monell v. Department of Social Services, 436 U.S. 658  (1978), a municipality may only be liable for the constitutional torts of its employees in one of three ways: (1) if its employee "acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity;" (2) "when the individual has policy making authority rendering his or her behavior an act of official government policy;" or (3) "if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes." McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir. 2005). Defendants contend that SDT has not offered sufficient evidence to withstand summary judgment under any of the foregoing methods of establishing municipal liability. For the reasons that follow, I disagree.[12]

---

[11]  While the two months passage of time may lessen the probative value of these alleged statements by Ackerman, I am required to view the evidence in the light most favorable to SDT.

[12] Regarding the third method – i.e. ratification, Defendants contend that SDT has not offered any evidence that the SRC was aware of the purportedly discriminatory basis for Ackerman's recommendation that IBS receive the contract when it voted to approve the resolution. Having found that there is sufficient evidence to defeat summary judgment under the first two methods of establishing municipal liability, I need not resolve the parties' arguments regarding the ratification method at this time.

### i. *Act Pursuant to a Formal Policy or Standard Operating Procedure*

Regarding the first method of proving municipal liability, Defendants argue that there is no evidence that they had a formal policy or standard operating procedure of selecting minority-owned contractors over majority-owned contractors on the basis of race outside of its official Anti-Discrimination Policy. Defendants note that SDT's own employees admitted that they never observed any evidence of such a discriminatory custom, policy or practice in their prior dealings with School District. (See Defs.' Opp. Ex. G, Spressart Dep. 67:22-68:19.) Defendants urge that their only policy was set forth in the School District's official Anti-Discrimination Policy which expressly prohibited race discrimination in the contracting process.

SDT counters that Defendants ignore the evidence in the record which establishes that members of the SRC repeatedly and explicitly directed School District employees to increase minority contracting over and above the twenty percent participation rate set by the MBEC and award contracts on the basis of race.

I agree with SDT and conclude that there is sufficient evidence upon which a reasonable fact finder could find that Defendants had an unwritten policy of favoring race discrimination in contract awards. Cardwell, Byars and Dougherty each testified that throughout 2010 the SRC repeatedly stated that the School District should increase minority contracting even though it already exceeded goals set by the MBEC. In fact, SRC Chairman Archie admitted as much. Viewed in the light most favorable to SDT, this evidence is sufficient to withstand Defendants' summary judgment challenge to the municipal liability claims.

### ii. *Act by an Individual with Policy Making Authority*

Regarding the second method for proving liability under Monell, a municipality will be liable when the individual who took the challenged action "has policy making authority

rendering his or her behavior an act of official government policy." McGreevy, 413 F.3d at 367 (citing Pembaur v. Cincinnati, 475 U.S. 469, 480-81 (1986). "A policy-maker is an official who has final, unreviewable discretion to make a decision or take action." McGreevy, 413 F.3d at 369, citing Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996). "The identification of officials who possess final policymaking authority with regard to a given act is an issue of state or local law," and "the determination as to who is a decisionmaker for the purposes of § 1983 liability is not a decision for the jury, but is for the court to decide as a matter of law." Dolly v. Borough of Yeadon, 428 F. Supp. 2d 278, 284 (E.D. Pa. 2006)

Defendants argue that the SRC, not Ackerman, was the final policymaker with respect to the decision to award IBS the contract. In support, Defendants cite to a Pennsylvania statute that provides:

> The affirmative vote of a majority of all the members of the board of school directors in every school district, duly recorded, showing how each member voted, shall be required in order to take action on the following subjects: . . . Entering into contracts of any kind, including contracts for the purchase of fuel or any supplies, where the amount involved exceeds one hundred dollars ($100).

24 Pa. Cons. Stat. Ann. § 5-508. Defendants also accurately note that the Pennsylvania statute describing the duties of school superintendents does not include the authority to enter into contracts on behalf of a school district. See Id. at § 10-1081.

SDT counters that its claim is that Ackerman blocked SDT's ability to form a contract by exercising her "supreme authority as superintendent to decide what was and was not presented to the SRC for approval." (Pl.'s Mem. p. 17 n.7.) As such, SDT urges that it is irrelevant that Ackerman lacked final authority to enter into a contract on behalf of the School District.

SDT explains that Ackerman was the highest level policymaker in terms of the ability to block the opportunity to form contracts with the School District. SDT cites to a School District

policy, implemented pursuant to a state law allowing the SRC to delegate responsibilities, that provides "[t]he Superintendent or designee shall develop and present to the SRC for its approval district safety plans that addresses [sic] school safety issues and includes applicable requirements of law and regulations." (Pl.'s Mem. Ex. II.) Based on this policy, SDT argues that Ackerman alone was authorized to develop and present to the SRC a resolution regarding the camera project as it was a response to the safe schools audit. Additionally, SDT notes that IBS started working on the project prior to SRC review or approval of the resolution to award IBS the contract. (See Pl.'s Mem. Ex. Y, Byars Dep. 49:9-14.)

Based on the foregoing, I conclude that SDT has offered sufficient evidence to establish that Ackerman was the final policy maker with respect to what contract resolutions, especially those involving safety issues, were presented to the SRC for consideration. This conclusion is bolstered by the fact that Section 1981's "prohibition against racial discrimination in the making and enforcement of contracts applies to all phases and incidents of the contractual relationship." Rivers v. Roadway Exp., Inc., 511 U.S. 298, 302 (1994). As such, Defendants' summary judgment challenge to the municipal liability claims is denied.

## C. *Damages*

Next, Defendants raise a host of objections regarding the nature and measure of damages SDT requested in its First Amended Complaint. Defendants first argue that, in the event that SDT can establish liability, any recovery must be limited to nominal damages because the undisputed evidence demonstrates that SDT has not suffered an actual, concrete injury as a result of the alleged discrimination. In support, Defendants note that SDT spent eight to ten days doing a walk-through of schools but SDT did not turn down any other work, hire employees or purchase equipment in anticipation of beginning work on the camera project. Defendants also

emphasize that SDT did not prepare a formal proposal because it believed it was premature to do so. Relatedly, Defendants contend that SDT's damages calculation is speculative.

SDT responds that an appropriate measure of damages is the profit that it would have received on the contract but for Ackerman's allegedly discriminatory intervention. To demonstrate that its damages calculation is not speculative, SDT notes that its expert's opinions are consistent with Spressart's testimony regarding his knowledge of the industry and SDT's past profit margins on comparable projects with the School District.

In light of Spressart's testimony and the report of SDT's expert, John F. Maloney, I find that SDT has offered more than sufficient evidence on the issue of damages to withstand summary judgment. Given the disputed issues of fact which exist regarding the nature and extent of SDT's alleged injury, it would be inappropriate to resolve, prior to trial, whether SDT's damages claim is appropriate or speculative. As such, Defendants' argument seeking to limit SDT's ability to recover to nominal damages is premature.

Defendants next argue that SDT has offered no evidence to support its request for punitive damages. Under Sections 1981 and 1983, punitive damages are recoverable where the "defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983). "[P]unitive damages claims against . . . individual defendants acting in their individual capacities remain viable under §§ 1981 and 1983." Udujih v. City of Philadelphia, 513 F. Supp. 2d 350, 358 (E.D. Pa. 2007) (citing Bennis v. Gable, 823 F.2d 723, 734 (3d Cir. 1987)).[13]

---

[13] SDT is only seeking punitive damages against Ackerman in her individual capacity. Defendants, nonetheless, argue that such a claim is not permissible because Ackerman is entitled to qualified immunity. According to Defendants, SDT's rights under Section 1981, as a white-owned corporation, were not clearly established.

23

Defendants urge that the "undisputed facts show that [Ackerman] confused SDT with a separate company – hardly a basis to permit punitive damages to be put to a jury." (Defs.' Opp. p. 25.) Again, Defendants' characterization of the summary judgment record is not accurate and ignores evidence proffered by SDT. Simply because Defendants believe that this evidence is not credible is hardly a reason to grant summary judgment. There is sufficient evidence on the punitive damages issue to withstand summary judgment. Defendants, however, may renew their objection to SDT's request for punitive damages after these disputed issues of fact are resolved at trial.

Lastly, Defendants argue that SDT failed to mitigate whatever damages it sustained and, therefore, it should be barred from recovering any damages. To the extent that a duty to mitigate attaches to a Section 1981 claim, "[m]itigation is an affirmative defense, so the burden of proving a failure to mitigate is on the defendant." Koppers Co., Inc. v. Aetna Cas. and Sur. Co., 98 F.3d 1440, 1448 (3d Cir. 1996).  Defendants failed to offer evidence that there was comparable work available to SDT and that SDT failed to pursue such work after the contract was awarded to IBS.

---

As noted above, SDT has offered sufficient evidence to withstand summary judgment on its allegation that Ackerman pulled the SDT resolution and directed the contract be awarded to IBS on the basis of race. If accepted by a fact finder, such evidence makes out a constitutional violation that was clearly established in September of 2010.

As noted above, numerous courts have found that a corporation can acquire a racial identity and Section 1981 has long prohibited race discrimination in the context of making and enforcing contracts. The United States Supreme Court has clearly held that Section 1981 prohibits "discrimination in the making or enforcement of contracts against, or in favor of, any race." McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 287 (1976).

Given that Defendants raised this argument for the first time in a passing objection to SDT's request for punitive damages and not as an independent substantive challenge to the 1981 claim itself, it appears that Defendants realize that their qualified immunity argument is on shaky ground.

**IV.**     **CONCLUSION**

For the foregoing reasons, Defendants' motion to strike is granted and Defendants' motion for summary judgment is denied. An appropriate order follows.