## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

| | | |
|---|---|---|
| **SECURITY & DATA TECHNOLOGIES, INC.** | : | |
| Plaintiff, | : | |
| | : | Civil Action |
| v. | : | |
| | : | No. 2:12–cv–02393 |
| **THE SCHOOL DISTRICT OF PHILADELPHIA, et al.,** | : | |
| | : | |
| Defendants. | : | |

_____

## DEFENDANTS' MOTION TO EXCLUDE THE
## <u>OPINIONS AND TESTIMONY OF JOHN F. MALONEY</u>

Defendants The School District of Philadelphia, The School Reform Commission, and The Estate of Arlene Ackerman, respectfully move for an Order excluding the opinions and testimony of John F. Maloney for the reasons set forth in the accompanying memorandum of law.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated: May 9, 2016          By: <u>*/s/  Jesse C. Klaproth*     </u>
                                 Joe H. Tucker, Jr.
                                 Michon L. Crawford
                                 Jesse C. Klaproth
                                 One Penn Center at Suburban Station
                                 1617 JFK Boulevard, Suite 1700
                                 Philadelphia, PA 19103
                                 (215) 875-0609

                                 **Attorneys for Defendants**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| **SECURITY & DATA TECHNOLOGIES, INC.** | : | |
| Plaintiff, | : | |
| | : | Civil Action |
| v. | : | |
| | : | No. 2:12–cv–02393 |
| **THE SCHOOL DISTRICT OF PHILADELPHIA, et al.,** | : | |
| | : | |
| Defendants. | : | |

_____

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO EXCLUDE
THE OPINIONS AND TESTIMONY OF JOHN F. MALONEY**

## I.   INTRODUCTION

Defendants School District of Philadelphia (the "School District"), the School

Reform Commission ("SRC"), and the Estate of Arlene Ackerman (collectively

"Defendants") request that this Court exclude the expert report of John F. Maloney, who

has been offered by Plaintiff Security & Data Technologies, Inc. ("SDT") as its economic

damages expert, and to preclude Mr. Maloney from testifying at the time of trial.  Mr.

Maloney's report and his opinions contained therein are based on unreliable facts and

data and an unreliable methodology.  As such it will not only be unhelpful to the jury, it

will be misleading.  In short, Mr. Maloney's opinions lack the necessary requirements for

expert testimony under Rule 702 and <u>Daubert</u>.

*First*, Mr. Maloney's report is an attempt by SDT to shoehorn speculative contract

damages into a case where it never received a contract.  In fact, SDT never made a

concrete proposal to the School District for the Persistently Dangerous School Security

Project (the "Project") because it was "too premature" and SDT had no expectations that

it would actually be awarded the contract.  Mr. Maloney's economic analysis is not based on any actual economic loss because SDT did not expect to be paid for the 8-10 days of surveys it performed; it did not hire any new employees; purchase new equipment; take out lines of credit; turn down other work; or suffer any actual, concrete loss.  SDT is also not looking to receive the profit that the contractor ultimately selected for the Project, IBS Communications, Inc. ("IBS"), received from working on the Project because there is no evidence in this case as to the profit that IBS actually received. Instead SDT is seeking damages in the form of prospective lost profits.  But, in his report, Mr. Maloney does not analyze the details of the Project as it was actually performed.  Mr. Maloney does not draw comparisons between IBS' performance on the Project and SDT's performance on the Project.  Mr. Maloney did not look at change orders, meeting minutes, or any of the facts of the Project as it was actually performed. He did not analyze the cost of the equipment; the contracts with the subcontractors; requisitions; or lines of credit for the actual Project.  SDT is asking this Court to permit Mr. Maloney to testify as an economic expert on the basis of nothing more than applying the median historical gross profit margin (an incorrect measure of lost profits) of SDT from 2012 (2 years after the Project in question), to the $7.5 million contract award, which was not even the rough projection SDT had for the Project (it projected the Project would cost $4.5 to $6.5 million).  Mr. Maloney's opinion is not based on facts or data; it is based on wishful thinking and back-of-the-napkin arithmetic.  This would not suffice in litigation involving the breach of a construction contract and should not be permitted here.

*Second*, Mr. Maloney's "methodology" is unreliable as it consists of nothing more than taking SDT's Median "Gross Profit on Construction Contracts" from 2012 (which is 29%) and applying it the $7.5 million contract award and deducting $75,000 in General and Administrative Expenses.  This deduction is based on the assumption that SDT would not have increased expenses, despite this being, by far, the largest project it would have ever handled.  The gross profit is not the correct measure of lost profits – it is net profit, which can only be calculated by factoring in all of the potential costs of a project.  In fact, Mr. Maloney notes some of the numerous "risk factors that affect construction projects," and cites to the lack of evidence that "SDT would have increased overtime costs, unbillable direct labor costs, wasted material and supplies, additional office expenses, and impacts on other ongoing projects" as proof that SDT would not have faced any of these risks.[1]  This purported methodology is *not* based on evidence, it is based on the absence of evidence or negative proof, which cannot pass muster under Rule 702 or <u>Daubert</u>.  Mr. Maloney's opinion is based on assumptions, speculation, and negative proof, without any analysis of the actual Project at issue.  This expert testimony will be both unreliable and unhelpful to a jury and must be excluded.

## II.  BACKGROUND

SDT, a white corporation, claims it was discriminated against by Defendants in connection with the Project to install security cameras at 19 schools that had been classified as Persistently Dangerous.  (<u>See</u> Amended Complaint, ECF No. 14 at ¶¶16, 31, 55-61.)  SDT's involvement with the Project was limited to eight to ten business

---

[1] This statement is based upon a faulty premise.  Having been provided with no evidence of increased cost factors is not the same as a lack of any evidence of such increased cost factors.  A more accurate statement by Mr. Maloney would have indicated that SDT did not provide him with evidence of increased cost factors that applied to the actual Project as executed by IBS.

days in which two of SDT's employees surveyed the schools classified as Persistently

Dangerous for purposes of preparing an estimate for the Project.  (See Deposition of

Kenneth Spressart at 132:13-133:20, attached as Exhibit 1 ("Spressart Dep.").)  SDT

did not expect to, nor did it request any compensation for this preliminary survey work.

(Spressart Dep. at 260:17-261:15.)

SDT also acknowledged that, outside the surveys of the schools, it had no plans

in place to begin any preliminary work prior to the SRC approving the budget for the

Project.  (See Spressart Dep. at 190:1-15.)  SDT did not forego working on any other

projects based upon any expectation that it would be awarded the Project.  (Id. at

190:18-24.)  SDT did not hire any additional employees or purchase any equipment in

expectation of being awarded the project.  (Id. at 191:1-5.)  In fact, SDT's Vice-

President of Sales, Kenneth Spressart, admitted that "[nothing was finalized on this job

as far as cost, sale price…." (Id. at 222:13-223:8.)  Mr. Spressart also testified that only

after the SRC had passed the resolution for the Project and SDT had "firm numbers"

would SDT finish its work to come up with a dollar value for the Project.  (Id. at 223:21-

224:15.)

SDT never put together a final estimate for the Project; it only reached a "rough"

verbal estimate for the project of $4.5 to $6 million – a far cry from the $7.5 million that

was ultimately budgeted for the project.  (Spressart Dep. at 187:2-188:2; 245:21-246:4

and Amended Complaint at ¶1.)  In fact, Mr. Spressart admitted that he expected the

School District to closely scrutinize that rough estimate "through the entire

process[2]…until we [SDT] had concrete scope, concrete quantities, concrete

---

[2] Mr. Spressart listed the steps in the process of entering into a contract with the School District
as: (1) "provide written costs" that "would be heavily scrutinized"; (2) "more than one round of

everything…because we [SDT] had to do [sic] competitive for the City." (Id. at 219: 1-220:4. Mr. Spressart also admitted that the SRC could have reduced the budget for the Project, which would have changed the scope of the Project. (Id. at 225:14-226:2.) Finally, SDT would not have started actual work on the Project, for which SDT expected payment, without first receiving a signed purchase order. (Id. at 185:21-187:1.)

Accordingly, after learning that SDT was not seeking compensatory damages for its time or expenses in surveying the schools; and that it was not seeking expectation damages for the purchase of equipment, hiring of employees or loss of other work; and it was not seeking contractual damages, *i.e.* the profit that was realized by IBS as the contractor ultimately selected for the Project, Defendants sought the deposition of a corporate designee to ascertain what, if any, damages SDT was claiming. In addition, SDT's counsel had previously advised that it was not using a damages expert for this case, so the deposition of a corporate designee was the only way for Defendants to ascertain what damages SDT was claiming before Defendants had to submit their expert report on damages. (See email exchange between J. Klaproth and P. Tomasco dated March 31, 2014, attached as Exhibit 2) ("***we don't need an expert for this case, and so you can cut the schedule back***.")

In response to a duly issued 30(b)(6) deposition notice, SDT produced its designee, Kenneth Spressart, SDT's Vice-President of Sales. Mr. Spressart, who had previously testified in his individual capacity, testified that SDT was seeking $2.25 million in damages. (See Rule 30(b)(6) Deposition at 9:10-21 attached as Exhibit 3

---

pricing…to get the number down"; and (3) "either a purchase order would show up or…once in a while I'd heard they had to go through a resolution to get it before the School Reform Commission for approval." (Spressart Dep. at 102:21-103:19.) None of these steps were reached by SDT in relation to the Project.

("30(b)(6) Dep.").)  According to SDT's corporate designee, SDT calculated its damages by taking the amount that was ultimately budgeted for the Project ($7.5 million – though SDT's rough estimate had been much lower) and applied a 30% gross profit margin, which was the average gross profit margin for its other work on behalf of the School District, and reached a figure of $2.25 million.  (See id. at 9:13-10:1.)  As of the August 22, 2014 expert report deadline, SDT put forth no other analysis in calculating its damages.[3]

Defendants served an expert report by Tim Van Noy, in which Mr. Van Noy opined that SDT's purported damages were entirely speculative, applied no methodology, and were unreliable.  (Van Noy Report, attached as Exhibit 4.)  After receiving Defendants' expert report, SDT realized that it would need to bolster its request for $2.25 million in damages by attaching the figure to the curriculum vitae and reputation of an expert.  This revelation resulted in Mr. Maloney's report, which Defendants now seek to exclude.  (Maloney Report, attached as Exhibit 5.)  The Maloney Report reduced SDT's damages to $2.1 million, but applied an identical "methodology" as SDT's designee by taking a historical gross profit margin, applying it to the full IBS contract award and then deducting $75,000 for General and Administrative Expenses.

## III.  ARGUMENT

### A.  This Court Must Act as a Gatekeeper to Exclude Purported Expert Opinions That Are Unreliable

---

[3] SDT's Vice President of Sales admitted that the gross profit margin can change throughout a project and that, although SDT aimed for a 30-35 percent gross profit margin on "small bid and chase jobs", he admitted that "it does not always work that way."  (Spressart at 48:15-18; 66:2-8.)

Rule 702 of the Federal Rules of Evidence allows for the testimony of expert witnesses only if "(a) the expert's scientific, technical, or other specialized knowledge will help the finder of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.  The Third Circuit has explained that Rule 702 contains "a trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider ex rel. Est. of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (citations omitted).  The proponent of expert testimony has the burden of establishing that it meets these requirements by a preponderance of proof. See Oddi v. Ford Motor Co., 234 F.3d 136, 144 (3d Cir. 2000).

In Daubert v. Merrell Dow Pharmaceuticals, the United States Supreme Court held that Rule 702 requires a court to examine any proffered expert testimony for reliability, methodology, and connection between the data and the expert's conclusion. 509 U.S. 579 (1993).   Although the Supreme Court's decision in Daubert was limited to "hard" scientific testimony, the Supreme Court extended its analysis to "soft" or non-scientific testimony in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999).  Based upon Kumho Tire, District Courts now must act as "gatekeepers" for all expert testimony. Id. at 141.

As discussed below, Mr. Maloney's testimony is not admissible under Rule 702 and Daubert because: (1) his opinion is not based on actual facts regarding the Project, but on assumptions and information cherry-picked by SDT; (2) his opinion relies on the purported absence of evidence, and not actual evidence; (3) his

purported methodology is mere speculation, with no consideration given to the actual

Project; and (4) his opinion will be misleading to a jury.

### B.    Mr. Maloney Performed No Analysis of the Actual Project

SDT seeks the lost profits it believes it would have earned, if it was awarded the

Project.  Such a claim "pits the plaintiff's right to the bargain of his contract against the

need to prevent jury verdicts based on speculation rather than proper proof."  Power

Restoration Int'l, Inc. v. PepsiCo, Inc., No. 12-1922, 2015 U.S. Dist. LEXIS 32415, *18

(E.D. Pa., Mar. 16, 2015) ("Power Restoration")[4] (citing Nat'l Controls Corp. v. Nat'l

Semiconductor Corp., 833 F.2d 491, 495 (3d Cir. 1987)).  The law permits recovery of

lost profits only where there is, inter alia, "evidence to establish them with reasonable

certainty."  Power Restoration, 2015 U.S. Dist. LEXIS 32415, *18 (citations and internal

quotation marks omitted); see Restatement (Second) of Contracts, § 352 ("The main

impact of the requirement of certainty comes in connection with recovery for lost

profits.").  While such evidence may consist of "probabilities and inferences," it must

"give a factfinder evidence from which damages may be calculated to a reasonable

certainty."  Power Restoration, 2015 U.S. Dist. LEXIS 32415, *18 (citations and internal

quotation marks omitted).  The evidence cannot be "too speculative, vague, or

contingent upon some unknown factor."  Id.  SDT must "provide the jury with a

reasonable amount of information so as to enable the jury fairly to estimate damages

without engaging in speculation."  Id. at *19.

The Maloney Report's lost profit assessment is not based on facts, such as, *inter

alia*, the working conditions, scheduling, subcontractor performance, material delivery,

project design, the contract terms, or subcontractor difficulties; rather, it is based on

[4] A copy of this decision is attached as Exhibit 6.

pure speculation.  The facts listed in the preceding sentence are taken directly from the Maloney Report, which are just some of the "[r]isk factors that [may] affect a construction project."  (Maloney Report at 12-13.)  Despite providing a laundry list of "risk factors," any of which may drive down the profit on a project, Mr. Maloney makes no effort to analyze any of those factors.[5]  Indeed, other than the IBS Agreement for Services, Mr. Maloney reviewed no documents from the actual Project – the thing that SDT is suing over.  Unlike most cases dealing with purported lost profits from a breach of a contract, in this case, SDT could actually determine the true loss it suffered rather than engaging in speculation.  Here, however, neither Mr. Maloney nor SDT even knows the profit, if any, that IBS realized from the Project – an important fact, given SDT's claim that it was wrongly deprived of what IBS received.  If the Maloney Report is not excluded, SDT could obtain a larger profit than its competition, IBS, actually received.

### C.   Mr. Maloney's Use of an Historical Gross Profit Margin is Unreliable and Unhelpful to the Jury

Mr. Maloney's "methodology" in calculating SDT's purported damages was to take a median historical gross profit margin from SDT's other projects with the School District and apply that percentage to the $7.5 million contract award, subtract $75,000 for General and Administrative expenses, and voila that equates to a $2.1 million profit.  The first problem with this "methodology" is that it takes a contract award of $7.5 million, but SDT's rough estimate for the Project was $4.5 million to $6.5 million,

---

[5] Mr. Maloney actually opines that SDT's increased markup on its subcontractors alleviates any of the risk factors he mentions.  (Maloney Report at 13.)  In other words, SDT should receive increased damages due to the existence of risk.  This is tortured logic and means that rather than increased risk driving down SDT's profit, Mr. Maloney opines that SDT is entitled to a larger margin due to the existence of potential risks.  This is another example of the spurious thinking employed in the Maloney Report.

not $7.5 million.   Nonetheless, the "methodology" is also flawed because it uses "gross profit," which is the "contract price less the direct cost to SDT of performing the contract."  (Van Noy Report at 8.)  As Defendants' expert points out, "Gross profit does not include general and administrative costs such as building rent, interest, utilities, taxes, or officer salaries."  (<u>Id</u>.)  Those expenses would be deducted from the gross profit to arrive at the net income – the true measure of SDT's actual purported injury. (<u>Id</u>.)

That is not the just the opinion of Defendants' expert, it is the appropriate and only measure of lost profits.  <u>See</u> <u>Power Restoration</u>, 2015 U.S. Dist. LEXIS 32415 at *16 ("Pennsylvania   courts   permit   plaintiffs   to   recover   lost   profits in the amount of 'net profits,' defined as 'gross revenue less fixed costs, and less variable costs pegged to the number of units sold.'").  Defendants' expert identified additional costs that SDT failed to consider in its damages calculations: "increased overtime costs; unbillable direct labor costs; wasted materials and supplies; additional interest expense; additional office expenses; and impact to other ongoing projects." (Van Noy Report at 9.)

Mr. Maloney provides no analysis of the additional costs SDT may have incurred on the Project and, thus, provides no analysis of SDT's prospective net profits for the Project – the true measure of lost profits.  Instead, Mr. Maloney opines that there is no evidence that SDT would have had these additional costs.  This is not a methodology founded on facts.  Instead, it is pure conjecture because there is no evidence that SDT would ***not*** have had these additional costs either.  Moreover, there is nothing to prevent SDT or Mr. Maloney from delving into the facts of the actual

Project and making a factual determination as to the true net profit that SDT would have realized on the Project. Mr. Maloney seems to place the blame for the dearth of factual evidence at the feet of Defendants, due to SDT's non-involvement with the Project, but this ignores the fact that SDT could have obtained this information from IBS and its subcontractors during discovery, but it did not.[6] As a result, the jury will have no evidence upon which to base SDT's request for $2.1 million in economic damages, other than speculation.

In addition to applying the wrong measure of lost profits, Mr. Maloney's "methodology" also relies on the historical gross profit margin SDT made on other projects with the School District, but fails to account for the fact that this Project would have been, by far, not only the largest project that SDT had performed for the School District, but it was more than twice the size of any project it had ever performed.[7] Defendants' expert pointed out the unreliability of Mr. Maloney's approach in his rebuttal report, specifically noting that the "average contract size over the six year period" relied upon by Mr. Maloney is $79,145 – approximately one percent (1%) of the contract at issue here. (Van Noy Rebuttal Report at 9, attached as Exhibit 6.) In addition, Defendants' expert pointed out that "[t]here appears to be little or no correlation between gross profit margin percentage and contract amount" and that the standard deviation of the gross profit percentage ranges from a "negative or loss of 81.26 percent

---

[6] "One of the worst abuses in civil litigation is the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion." Therasense, Inc. v. Becton, Dickinson & Co., Nos. 04-2123/3327/3732 & 05-37, 2008 U.S. Dist. LEXIS 124780, at *13 (N.D. Cal. May 22, 2008).

[7] Prior to this Project, the largest project that SDT had ever performed for the School District was for $950,000, which was "actually two jobs in one." (Paley Dep. at 204:5-17.) In fact, it would be the largest contract that SDT had ever performed for any client - the closest was a job for $3.5 million. (Paley Dep. at 205:24-206:15.)

to a high of 91.88 percent", which essentially renders SDT's historical gross profit margin as meaningless and predictive of nothing.

Mr. Maloney also fails to point out that in all but two of its prior projects for the School District, SDT was not acting as a prime contractor.  (Spressart Dep. at 93:19-94:9.)  This is important for two reasons.  First, as pointed out by Defendants' expert, the fact that this Project was so much larger than prior projects makes SDT's assumption purely speculative that it would not have experienced any additional costs on the Project because there is no similar project for it to compare.  Second, the size of this Project and the fact that SDT was serving as prime contractor renders the "methodology" employing median historical gross profit margin even more unreliable because there is no comparable business history to assess SDT's claim for lost profits.

In such circumstances, this Court and Pennsylvania state courts have held plaintiffs to a higher standard to provide reasonably certain evidence of lost profits.  See Power Restoration, 2015 U.S. Dist. LEXIS 32415 at *25.  For example, in Power Restoration, Judge Pratter concluded that the plaintiff's claim for lost profits was too speculative to submit to the jury.  In reaching that conclusion, the court pointed out that the plaintiff, as a new and untried business, could not recover lost profits (based on a 30 percent net profit), calculated by using a "self-serving spreadsheet…listing revenues and expenses" and projected budgets from past years along with conclusory testimony of the V.P. of Business Operations and of the President and CEO that the plaintiff expected to earn a 30 to 40 percent profit.  Id. at *26.  Judge Pratter also found that the historical data provided by the plaintiff only cited to a single data point, which was

insufficient for a jury to determine lost profits with a reasonable degree of certainty.  Id. at *29 ("Making unsupported numbers look efficacious does not make them so.").

Here, there are no meaningful data points in the historical data relied upon by Mr. Maloney because SDT had never performed a contract of this magnitude.  Also, even if the prior projects provided some indication, beyond speculation, as to SDT's prospective lost profits on the Project (they do not), the only meaningful historical examples are the two instances in which SDT served as a prime contractor.  The other projects provide the jury with no insight into SDT's historical performance as a prime contractor.  In short, this Project was unprecedented in the history of SDT in both size and role.  Therefore, to allow Mr. Maloney to use SDT's inapposite projects as a model to project its anticipated gross profits on this Project is not only unreliable and unhelpful to the jury, it is misleading and would result in the jury speculating as to lost profits, not calculating those lost profits with reasonable certainty.

## IV.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court grant its Motion and exclude the opinions and testimony of John F. Maloney.

Respectfully submitted,

**TUCKER LAW GROUP, LLC**

Dated: May 9, 2016               By: _/s/ Jesse C. Klaproth_____
Joe H. Tucker, Jr.
Michon L. Crawford
Jesse C. Klaproth
One Penn Center at Suburban Station
1617 JFK Boulevard, Suite 1700
Philadelphia, PA 19103
(215) 875-0609

**Attorneys for Defendants**

## <u>CERTIFICATE OF SERVICE</u>

I, Jesse Klaproth, Esquire, do hereby certify that I caused to be served a true and correct copy of Defendants' Motion in *Limine* to Preclude the Testimony of Nancy Quinn on all counsel of record by ECF notification:

**TUCKER LAW GROUP, LLC**

Dated: May 9, 2016             By: <u>*/s/  Jesse C. Klaproth*</u>
                                             Joe H. Tucker, Jr.
                                             Michon L. Crawford
                                             Jesse C. Klaproth
                                             One Penn Center at Suburban Station
                                             1617 JFK Boulevard, Suite 1700
                                             Philadelphia, PA 19103
                                             (215) 875-0609