# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **SECURITY and DATA TECHNOLOGIES, INC.,** | CIVIL ACTION |
| Plaintiff, | |
| v. | No. 12-2393 |
| **SCHOOL DISTRICT OF PHILADELPHIA, et al.,** | |
| Defendants. | |

**Goldberg, J.**                                                        December 20, 2016

## Memorandum Opinion

Following a six day trial, a jury determined that Plaintiff, Security and Data Technologies, Inc. ("SDT") was denied a multi-million dollar contract with the School District of Philadelphia on the basis of race and in violation of 42 U.S.C. § 1981. The jury found the School District of Philadelphia and its former Superintendent Dr. Arlene Ackerman liable for $2,335,000.[1]

Presently before me is Defendants' renewed motion for judgment as a matter of law or, in the alternative, a new trial. In their motion, Defendants argue that (1) SDT, a white owned corporation, had not acquired a racial identity, and therefore, cannot bring a claim under 42 U.S.C. § 1981; (2) the testimony of SDT's damages expert should have been stricken as unreliable; and (3) the School District cannot be held liable for the actions of Dr. Ackerman under 42 U.S.C. § 1983. As Defendants' arguments are simply a rehash of issues previously presented and considered, the motion will be denied.

---

[1] A third Defendant, the School Reform Commission ("SRC"), was found not liable.

I.      **PROCEDURAL HISTORY**

SDT brought claims against the School District, its governing body, the School Reform Commission ("SRC"), and its former Superintendent, Arlene Ackerman pursuant to 42 U.S.C. §§ 1981, 1983. On November 4, 2015, I denied Defendants' motion for summary judgment, ruling that genuine issues of material fact existed as to SDT's claims.

Prior to trial, I held a hearing on Defendants' motion challenging the admissibility of SDT's damages expert, John Maloney. After hearing Maloney's testimony and argument from the parties, I concluded that Maloney's proposed testimony satisfied the standards for admissibility set by Federal Rule of Evidence 702 and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).

Following trial, SDT filed a motion for attorney's fees pursuant to 42 U.S.C. § 1988. That motion is addressed in a separate opinion. Defendants then filed the instant renewed motion for judgment as a matter of law or, in the alternative, a new trial.

II.     **LEGAL STANDARD**

A.      **Renewed Judgment as a Matter of Law**

Federal Rule of Civil Procedure 50(a) provides that the court may grant a motion for judgment as a matter of law if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). A renewed motion for judgment as a matter of law may be granted only if "the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief." <u>Trabal v. Wells Fargo Armored Serv. Corp.</u>, 269 F.3d 243, 249 (3d Cir. 2001) (quotation marks and citations omitted).

"Entry of judgment as a matter of law is a sparingly invoked remedy, granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007). When conducting this "narrow inquiry," courts "must refrain from weighing the evidence, determining the credibility of witnesses, or substituting our own version of the facts for that of the jury." Id.

### B. New Trial

Following a jury trial, the court may "grant a new trial on all or some of the issues--and to any party . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a).

## III. DISCUSSION

At the close of SDT's case-in-chief and at the conclusion of all evidence, Defendants moved for judgment as a matter of law on the basis that (1) SDT 's section 1981 claim fails because SDT had not established that it had acquired a racial identity; (2) SDT's expert testimony should have been stricken as it was unreliable and, therefore, inadmissible under Daubert and Federal Rule of Evidence 702 and, had such testimony been stricken, SDT would have been unable to offer any proof of actual injury; and (3) there was no evidence upon which to find the School District liable for the actions of Dr. Ackerman under 42 U.S.C. § 1983. I denied Defendants' motion in its entirety.

In the instant motion, Defendants renew these three arguments and again seek judgment as a matter of law.

A.     Racial Identity for Section 1981 Purposes

Defendants first argue that SDT did not establish that it has a racial identity and, thus, Defendants are entitled to judgment as a matter of law on SDT's section 1981 claim. Defendants urge that a corporation only acquires a racial identity for section 1981 purposes where (1) the majority of its shareholders consist of one race and (2) it has been "certified as a corporation with a racial identity." (Defs.' Mot. pp. 7-8.) Defendants cite to Thinket Ink Information Resources, Inc. v. Sun Microsystems, Inc., 368 F.3d 1053 (9th Cir. 2004) as support for this two-part test.

Defendants raised this argument in their motion for summary judgment. In denying that motion, I disagreed with Defendants' reading of Thinket and held that the overwhelming majority of precedent recognizes that a corporation can bring a section 1981 claim if it has acquired a racial identity or if it has suffered racial discrimination. Sec. & Data Techs., Inc. v. Sch. Dist. of Philadelphia, 145 F. Supp. 3d 454, 464 (E.D. Pa. 2015). I concluded that the broader formulation I adopted was consistent with the plain language of section 1981 and furthers section 1981's purpose of providing redress for racial discrimination. Id. at 464-65.

Nothing presented in Defendants' instant motion demonstrates that that conclusion was erroneous. The trial record contains more than sufficient evidence on which a reasonable fact finder could conclude that SDT acquired a racial identity and/or suffered racial discrimination.

B.     SDT's Damages Expert

Next, Defendants argue that SDT's expert, John Maloney, should not have been permitted to testify because his opinion "was nothing more than a CPA prattling off made-up numbers founded upon multiple layers of unreliable speculation." (Defs.' Mot. p. 12.) Defendants urge that if Maloney had not been permitted to testify, SDT would have been unable

4

to prove that it sustained any actual injury and, accordingly, the section 1981 claim would have been dismissed.[2]

Federal Rule of Civil Procedure 702 governs the admissibility of expert testimony, and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003) (quoting In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741-43 (3d Cir. 1997)). In evaluating whether an expert opinion is admissible, the district court acts as a gatekeeper, excluding opinion testimony that does not meet these requirements. Id. The burden is on the party offering the evidence to establish admissibility by a preponderance of the evidence. Padillas v. Stork-Gamco, Inc., 186 F.3d 412, 418 (3d Cir. 1999).

In considering whether an expert's method is reliable, courts should consider: (1) whether it is based upon testable hypotheses; (2) whether the method has been subject to peer review; (3) the known or potential error rate; (4) "the existence and maintenance of standards controlling the

---

[2] On the issue of lost profits, SDT also presented the testimony of Ken Spressart, SDT's Vice President of Sales. It appears that the jury relied on Spressart's testimony when assessing damages. (See infra note 2.) This fact undercuts Defendants' argument that SDT would have been unable to prove that it sustained any actual injury had Maloney's testimony been excluded.

technique's operation"; (5) whether it is generally accepted; (6) the relationship of the technique to other methods that have been deemed reliable; (7) the expert's experience or qualification with the technique or method; (8) non-judicial uses the method has been put to; and (9) all other relevant factors. In re Paoli, 35 F.3d at 742 n.8. The reliability requirement is not to be applied "too strictly" and is satisfied as long as the expert has "good grounds" for his or her opinion. Holbrook v. Lykes Bros. S.S. Co., 80 F.3d 777, 784 (3d Cir. 1996). An expert's opinion is supported by good grounds if it is "based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" Elcock v. Kmart Corp., 233 F.3d 734, 745 (3d Cir. 2000).

In support of their argument that Maloney should not have been permitted to testify under Daubert and Rule 702, Defendants argue that the data Maloney analyzed and the methodology he applied to that data were unreliable. I note that Defendants largely raised these same arguments prior to trial in their Daubert motion and, for the reasons discussed below, nothing in the instant motion convinces me that my previous rejection of these arguments was erroneous.

    i.    **Unreliable Data**

Maloney arrived at his damages number by calculating a median profit margin from SDT's other construction projects during 2010 and 2012. After removing the ten projects with the lowest profit margins and the ten projects with the highest profit margins during those years, Maloney determined that the median profit margin of the remaining fifteen projects was approximately 29%. After subtracting $75,000 for increased "general and administrative" expenses, Maloney applied the 29% median profit margin to the value of the actual contract awarded to IBS. Based on the foregoing, Maloney determined that SDT would have netted at least a $2.1 million profit from the contract at issue.

According to Defendants, Maloney's testimony and report should have been excluded because his opinion was based on "speculative facts" rather than actual information regarding the project as performed by IBS. For example, Defendants note that Maloney's 29% profit margin figure was based on data concerning projects that were still in progress and that profitability can change throughout the life of a project. Defendants also argue that Maloney failed to account for the fact that the prior contracts on which he relied varied in size and type. Defendants contend that Maloney should have premised his analysis on data about the actual project as IBS completed it or Maloney should have created a detailed cost estimate for the actual project.

I rejected these exact arguments after a <u>Daubert</u> hearing. As I previously explained, Defendants' insistence that Maloney should have considered the facts of the project as IBS actually performed the project assumes that SDT would have performed the job the same way that IBS did. (<u>See</u> Trial Tr. 9:12-21, June 21, 2016.) I noted that Maloney explained that companies can have widely different methods for accomplishing the same project and, therefore, the profit margins on a particular project may vary from company to company. (<u>Id.</u>) Nothing in Maloney's testimony at trial or Defendant's motion convinces me that Maloney's testimony should have been excluded because he failed to premise his analysis on data concerning IBS' execution of the project.

Additionally, I previously concluded and remain convinced that the other issues raised by Defendants concerning the data on which Maloney relied go to weight rather than admissibility. In reaching this conclusion after the <u>Daubert</u> hearing, I explained that Defendants were free to cross examine Maloney on his failure to obtain a cost estimate or the significance of the fact that he primarily analyzed the profitability of uncompleted projects. (<u>Id.</u> at 9:5-11.) "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof

7

are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596. In fact, counsel for Defendants conducted a lengthy cross-examination of Maloney regarding the data on which he relied.

### ii. Methodology

In the instant motion, Defendants again object to Maloney's methodology and urge that this testimony should have been stricken. After careful consideration of his report and the testimony he gave at the Daubert hearing, I concluded that Maloney had good grounds for his analysis. I noted that he assessed SDT's past construction contracts, the associated profit margins, calculated an average rate of profit, deducted increased expenses and applied the resulting profit margin to the value of the actual contract awarded to IBS.

Maloney also testified that the 29% figure he calculated was consistent with other analyses he did of the profitability of SDT's past contracts with the School District and SDT's past contracts in general. Importantly, Maloney also explained that the methodology he employed in calculating SDT's damages was the same methodology he uses when assisting companies in assessing the profitability of potential projects. Lastly, I found Maloney's explanation regarding the costs he deducted to be reasonable. Maloney offered a sound basis for his conclusion that other than general insurance and office expenses SDT's general and administrative expenses would not increase if it had been awarded the project contract. In sum, I remain convinced that the assessment of past profitability of an established business like SDT is a reliable basis for estimating lost profits and Maloney's application of this methodology satisfied the requirements for admissibility.

During the Daubert proceedings, I rejected Defendants' argument that Maloney's testimony was akin to the expert testimony found to be inadmissible in JMJ Enterprises, Inc. v.

Via Veneto Italian Ice, Inc., 1998 WL 175888 (E.D. Pa. Apr. 15, 1998) and Legendary Art, LLC v. Godard, 888 F. Supp. 2d 577 (E.D. Pa. 2012). Nonetheless, Defendants have renewed their argument that JMJ Enterprises and Legendary Art demonstrate that Maloney's testimony should have been excluded.

As I previously explained, in JMJ Enterprises, the district court concluded that the testimony of plaintiff's damages expert was inadmissible based on multiple deficiencies not present in Maloney's testimony. (See Trial Tr. 9:22-10:11, June 21, 2016.) In JMJ Enterprises, the district court found the expert's testimony to be inadmissible because (1) the expert knew "very little" about the relevant industry, (2) he based his conclusions on his experience alone, and (3) he had no explanation for why he accounted for certain expenses but not others. 1998 WL 175888, at *8-10. As previously noted, Maloney has extensive experience in the construction industry, based his opinion on data concerning SDT's other projects, not just his experience and offered an adequate explanation for his decision to account for particular expenses. (Trial Tr. 9:22-10:11, June 21, 2016.) For these reasons, I remain convinced that JMJ Enterprises is distinguishable and does not demonstrate that Maloney's testimony should have been stricken.

Likewise, in Legendary Art, the plaintiff's damages expert primarily relied upon business plans and profit projections developed by unknown third-parties who did not articulate the methodology they had used to arrive at the projections. The district court excluded the expert's testimony because he failed to independently verify the methods or reasoning underlying the profit projections which formed the "linchpin" of his opinions and there was no evidence regarding how those projections had been created. 2012 WL 3550040, at *3-5. During the Daubert hearing, I concluded that the defects motivating the court's decision to exclude the

expert's testimony in Legendary Art were not present in Maloney's testimony. Maloney did not merely parrot an unknown third-party's profit projections. Rather, he calculated a net profit margin based on SDT's historical profitability data. In doing so, he accounted for outliers as well as increased costs. Both the data on which he relied and the methodology he applied are sufficiently reliable. As such, his testimony was properly admitted at trial. Nothing in Defendants' motion or Maloney's testimony convinces me that Legendary Art compels a different result. (Trial Tr. 10:12-10:23, June 21, 2016.)[3]

### C. Municipal Liability

For the third time, Defendants seek a determination that the School District cannot be held liable for the actions of Dr. Ackerman. Defendants raised this argument at summary judgment, in their motion for judgment as a matter of law during trial and again in the instant motion.

Under Monell v. Department of Social Services, 436 U.S. 658 (1978), a municipality may be held liable for the constitutional torts of its employees in one of three ways: (1) if its employee "acted pursuant to a formal government policy or a standard operating procedure long accepted within the government entity;" (2) "when the individual has policy making authority

---

[3] In its opposition to the instant motion, SDT argued that any supposed error in admitting Maloney's testimony was harmless because it appears that the jury premised its damages award on the testimony of Spressart.

Spressart testified that, based on his experience and review of the contract, he would have expected SDT's profit margin to have been between $840,000-$1,000,050 on labor, between $542,500-$620,000 on professional services and between $612,500 and $875,000 on materials. SDT states that it appears that the jury accepted Spressart's estimates of $840,000 on labor, $620,000 on professional services and $875,000 on labor because only that combination of Spressart's estimates totals the $2,335,000 damages award the jury returned.

Although I agree with SDT that the jury does appear to have based its award on Spressart's testimony, it is unnecessary to resolve this question because I have concluded that the decision to admit Maloney's testimony was proper.

rendering his or her behavior an act of official government policy;" or (3) "if an official with authority has ratified the unconstitutional actions of a subordinate, rendering such behavior official for liability purposes." McGreevy v. Stroup, 413 F.3d 359, 367 (3d Cir. 2005).

### i. Formal Policy or Standard Operating Procedure

Defendants argue that no evidence was introduced at trial to support a finding that there was a "formal policy or standard operating procedure by which the School District selected minority-owned prime contractors over majority-owned prime contractors." (Defs.' Mot. p. 19.)[4] According to Defendants, the jury heard only "stray comments made by the SRC about identifying qualified minority contractors." (Id. at 20.) Lastly, Defendants urge that the policy and custom of the School District was set forth in its anti-discrimination policy, which forbids preferential treatment based on race in contract decisions.

Contrary to Defendants' characterization of the record, multiple witnesses credibly testified at trial that, throughout 2010, members of the SRC repeatedly admonished School District staff to increase contract awards to minority owned businesses despite the fact the School District was already exceeding the minority hiring goals established by the City of Philadelphia. For example, Francis X. Dougherty, Deputy Chief Business Officer for Operations at the School District, testified that increasing minority participation above and beyond the established goals was a "constant theme" at every SRC meeting. SRC Chairman Robert Archie corroborated Dougherty's testimony. Eric Mayes, a reporter for the Philadelphia Tribune,

---

[4] I agree with SDT that Defendants' articulation of the policy as specifically tied to prime contracts rather than contracts in general is inconsistent with SDT's theory at trial and the evidence SDT adduced in support thereof. SDT argued "that there was a policy adopted by the SRC and the School District that authorized the increase of minority contracting above goals established by the City of Philadelphia, which in turn reduced contracts to 'majority'/white-owned corporations." This theory of the policy was reflected in the instructions given to the jury.

testified via video that Dr. Ackerman explained to him that she "interjected" herself into the contract decision to follow the SRC's directives.

There was more than sufficient evidence introduced at trial to establish that the decision to deselect SDT and award the contract to IBS was made pursuant to the School District's and the SRC's policy or standard operating procedure of awarding contracts on the basis of race and outside of the goals established by the City of Philadelphia. This alone is sufficient to support the jury's verdict against the School District. That said, I will nonetheless consider whether the trial record also contains sufficient evidence to support a verdict against the School District pursuant to the policy-making method of proving municipality liability.

### ii. Policy Making Authority

Regarding the second method for proving liability under Monell, a municipality will be liable when the individual who took the challenged action "has policy making authority rendering his or her behavior an act of official government policy." McGreevy, 413 F.3d at 367 (citing Pembaur v. Cincinnati, 475 U.S. 469, 480-81 (1986). "A policy-maker is an official who has final, unreviewable discretion to make a decision or take action." McGreevy, 413 F.3d at 369, citing Kneipp v. Tedder, 95 F.3d 1199, 1213 (3d Cir. 1996). "The identification of officials who possess final policymaking authority with regard to a given act is an issue of state or local law," and "the determination as to who is a decisionmaker for the purposes of § 1983 liability is not a decision for the jury, but is for the court to decide as a matter of law." Dolly v. Borough of Yeadon, 428 F. Supp. 2d 278, 284 (E.D. Pa. 2006).

In the instant motion, Defendants again argue that the SRC, not Dr. Ackerman, was the final policymaker with respect to the decision to award IBS the contract. At summary judgment,

Defendants raised the identical argument. Defendants again cite to a Pennsylvania statute that provides:

> The affirmative vote of a majority of all the members of the board of school directors in every school district, duly recorded, showing how each member voted, shall be required in order to take action on the following subjects:... Entering into contracts of any kind, including contracts for the purchase of fuel or any supplies, where the amount involved exceeds one hundred dollars ($100).

24 Pa. Cons. Stat. Ann. § 5–508. In response to both the motion for summary judgment and the instant motion, SDT pointed out that its claim is that Dr. Ackerman blocked SDT's ability to form a contract by exercising her authority as Superintendent to decide what was and was not presented to the SRC for approval. The trial record amply supports this position.

In further support, SDT relies on a School District policy, implemented pursuant to a state law allowing the SRC to delegate responsibilities, that provides "[t]he Superintendent or designee shall develop and present to the SRC for its approval district safety plans that addresses [sic] school safety issues and includes applicable requirements of law and regulations." (Pl.'s Resp. pp. 23-24.) Dr. Ackerman's conduct in deselecting SDT as a recipient of the school safety contract fits within this policy.

Based on the foregoing, I concluded that SDT established that Dr. Ackerman was the final policy maker with respect to what contract resolutions, especially those involving safety issues, were presented to the SRC for consideration. Sec. & Data Techs., Inc., 145 F. Supp. 3d at 468–69. Nothing in Defendants motion or the evidence introduced at trial calls that conclusion into question.

### iii. Ratification

Having found that there is sufficient evidence under the first two methods of establishing municipal liability, I need not resolve the parties' arguments regarding ratification.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion will be denied in its entirety. An appropriate Order follows.